No. 22-6074

=============================================================

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

_____

PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION,

*Plaintiff-Appellant,*

v.

GLEN MULREADY, *in his official capacity as*
Insurance Commissioner of Oklahoma, and
OKLAHOMA INSURANCE DEPARTMENT,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the Western District of Oklahoma
The Hon. Bernard M. Jones
No. 5:19-cv-977-J

=============================================================

## APPELLANT RESPONSE TO THE UNITED STATES
## AMICUS BRIEF IN SUPPORT OF NEITHER PARTY
## URGING AFFIRMANCE IN PART AND REVERSAL IN PART

=============================================================

DEAN RICHLIN
KRISTYN M. DEFILIPP
ANDREW M. LONDON
FOLEY HOAG LLP
155 SEAPORT BOULEVARD
BOSTON, MA 02110
TEL.: (617) 832-1000

JOEL W. HARMON
MARY H. TOLBERT
CROWE & DUNLEVY
324 NORTH ROBINSON AVE, SUITE 100
OKLAHOMA CITY, OK 73102
TEL.: (405) 235-7700

*Counsel for Appellant*

## <u>TABLE OF CONTENTS</u>

**I.  Introduction**................................................................................................1

**II.  The Act is Preempted by ERISA as Applied to Self-Funded Plans and Their Third-Party Administrators**................................................................3

   a.  The United States correctly applies the ERISA "connection with" standard to the AWP Provision, Retail-Only Pharmacy Access Standards, and Cost-Sharing Discount Prohibition. ................................................................................3

   b.  The United States misapplies the correct legal standard to the Probation-Based Pharmacy Limitation and misunderstands the facts. ..................................5

   c.  The Saving Clause and the Deemer Clause provide no refuge to Oklahoma. ......................................................................................................11

      *i.  Oklahoma has not argued that the Saving or Deemer Clauses apply.* ....12

      *ii.  The Saving Clause permits states to regulate insurance, but the Deemer Clause exempts self-funded plans from that carveout.* .....................................13

      *iii.  The United States' unprecedented reading of the Deemer Clause must be rejected.* ............................................................................................................15

**III. The Act Interferes with Medicare Part D Standards and is Preempted** ....24

   a.  This Court should define the standard for Medicare preemption consistent with the plain language, legislative history, and law in other circuits. ................24

   b.  In finding the AWP Provision to be preempted under Part D, the United States adopts a field preemption approach. .........................................................26

**IV. Conclusion** ...................................................................................................27

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Med. Sec. v. Bartlett*,
   111 F.3d 358 (4th Cir. 1997) .......................................................................... 22, 23

*America's Health Insurance Plans v. Hudgens*,
   742 F.3d 1319 (11th Cir. 2014) .................................................................... 20, 21

*Bill Gray Enters. v. Gourley*,
   248 F.3d 206 (3d Cir. 2001) ........................................................................... 22, 23

*Bimbo Bakeries USA, Inc. v. Sycamore,*
   39 F.4th 1250 (10th Cir. 2022) ...........................................................................12

*CIGNA Healthplan v. Louisiana ex rel. Ieyoub*,
   82 F.3d 642 (5th Cir. 1996) .................................................................................10

*Daley v. Marriott Int'l, Inc.*,
   415 F.3d 889 (8th Cir. 2005) ...............................................................................21

*Exby-Stolley v. Bd. of Cnty. Commissioners*,
   979 F.3d 784 (10th Cir. 2020) .............................................................................17

*FMC Corp. v. Holliday*,
   498 U.S. 52 (1990) ................................................................................... 9, 14, 15

*Fort Halifax Packing Co. v. Coyne*,
   482 U.S. 1 (1987) .................................................................................................19

*Gobeille v. Liberty Mut. Ins. Co.*,
   577 U.S. 312 (2016) ...........................................................................................8, 9

*Gonzalez v. Prudential Ins. Co. of America*,
   901 F.2d 446 (5th Cir. 1990) ...............................................................................22

*Howard v. Parisian, Inc.*,
   807 F.2d 1560 (11th Cir. 1987) ...........................................................................22

*Ingersoll-Rand Co. v. McClendon*,
   498 U.S. 133 (1990) .............................................................................................14

*Lincoln Mut. Cas. Co. v. Lectron Prod., Inc.*, *Employee Health Benefit Plan*,
   970 F.2d 206 (6th Cir. 1992) ...............................................................................23

*Medicaid & Medicare Advantage Prods. Ass'n of P.R., Inc. v. Hernández*,
   58 F.4th 5 (1st Cir. 2023)......................................................................... 25, 26, 27

*Metropolitan Life v. Mass.*,
    471 U.S. 724 (1985) ........................................................................ 15, 19

*Moore v. Provident Life Insurance*,
    786 F.2d 922 (9th Cir. 1986) ........................................................ 22, 23

*Mullenix v. Aetna Life & Cas. Ins. Co.*,
    912 F.2d 1406 (11th Cir. 1990) .................................................... 18, 21

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
    514 U.S. 645 (1995) ...........................................................................9, 10

*NGS Am., Inc. v. Barnes*,
    805 F. Supp. 462 (W.D. Tex. 1992) .....................................................22

*PCMA v. Wehbi*,
    18 F.4th 956 (8th Cir. 2021) ..................................................... 5, 10, 25

*Prudential Insurance Company of America v. National Park Medical Center*,
    413 F.3d 897 (8th Cir. 2005) ...............................................................21

*Rush Prudential HMO v. Moran*,
    536 U.S. 355 (2002) ..................................................................... 19, 20

*Rutledge v. PCMA*,
    141 S. Ct. 474 (2020) ............................................................................7

*San Juan Cty. v. United States*,
    503 F.3d 1163 (10th Cir. 2007) ..........................................................12

*Shaw v. Delta Air Lines*,
    463 U.S. 85 (1983) ................................................................................6

*United States v. Elliott*,
    937 F.3d 1310 (10th Cir. 2019) ..........................................................17

*UNUM Life Ins. Co. v. Ward*,
    526 U.S. 358 (1999) ............................................................................19

*Wyo. Farm Bureau Fed'n v. Babbitt*,
    199 F.3d 1224 (10th Cir. 2000) ..........................................................12

## Statutes

15 U.S.C. § 1011 .....................................................................................13

29 U.S.C. § 1144(b)(2)(A) .....................................................................13

29 U.S.C. § 1144(b)(2)(B) .....................................................................14

29 U.S.C. § 1144(b)(2)(A)-(B) ...............................................................17

36 O.S. § 6961(A)-(B) ............................................................................4

36 O.S. § 6962(B)(4).............................................................................3

36 O.S. § 6962(B)(5) .............................................................................1

36 O.S. § 6963(E) ..................................................................................4

**Other Authorities**

H.R. Rep. No. 108-391 (2003)....................................................... 24, 27

H.R. Rep. No. 94-1785 (1977)....................................................... 13, 14

Patricia M. Danzon, Testimony before U.S. Dep't of Labor,
    2014 ERISA Advisory Council, *PBM Compensation and Fee Disclosure*, at 3
    (June 19, 2014).......................................................................... 16, 17

U.S. Amicus Br., *Rush Prudential v. Moran*,
    No. 00-1021 (2001). ........................................................................ 20

## I.     Introduction

The *amicus* brief of the United States ("United States" or the "government") confirms that the Court should reverse and hold the challenged provisions of Oklahoma's Patient's Right to Pharmacy Choice Act ("the Act") are preempted as applied to both ERISA plans and Medicare Part D.

Concerning ERISA, the United States agrees that Oklahoma's statutory provisions regulating "pharmacy-network composition and cost-sharing terms go to core aspects of plan structure and benefit design" because "they directly regulate the terms of participants' coverage." U.S.Br. at 12. These provisions "also interfere with 'nationally uniform plan administration'" by imposing Oklahoma-specific rules for pharmacy networks. U.S.Br. at 13. And the government agrees that Oklahoma's Probation-Based Pharmacy Limitation (36 O.S. § 6962(B)(5)) regulates "pharmacy-benefit design" by "eliminat[ing] one possible basis for excluding a pharmacy from a PBM's network." U.S.Br. at 10. The government further acknowledges that to the extent the Act "directly regulates only PBMs, not ERISA plans," it still has an impermissible "connection with" ERISA because, regardless of form, the Act "functions as a regulation of an ERISA plan itself." U.S.Br. at 15-16.

Concerning Medicare, the United States concurs that Oklahoma's any willing provider ("AWP") law is "preempted under the terms of the Medicare Part D express preemption provision" because it is "inconsistent with . . . CMS-issued standards

and the deliberate decision CMS made to require access only to standard networks." U.S.Br. at 23-24. These contentions are correct and strongly support reversal.

However, the United States' brief makes two critical errors concerning ERISA that contradict long-established ERISA precedent and would unduly narrow the scope of preemption.

First, the government introduces an unfounded analytical approach to resist preemption of the Probation-Based Pharmacy Limitation, arguing that its effect on benefit design is "*de minimis*." Courts have long held that state laws directly regulating ERISA benefit design are preempted—without consideration of any exceptions based on the magnitude of such impact. This novel approach, which appears transplanted from the separate analytical standard for cost regulations, would transform the ERISA preemption analysis. Further, by inviting judges to make case-by-case calls on whether regulations of plan design are sufficiently impactful, it undermines the predictability of ERISA preemption upon which employers rely.

Second, the United States suggests that ERISA's Saving Clause applies, and the Deemer Clause does not exempt the challenged provisions from the Saving Clause's reach. But this contention was long ago abandoned by Oklahoma. Moreover, the United States' position can be readily rejected as inconsistent with ERISA's statutory language, structure, and purpose, decades of judicial precedent,

2

and ingrained industry expectations. If the Deemer Clause were suddenly reinterpreted to apply only when self-funded plans administer their own benefits, as the United States contends, countless judicial decisions would be vitiated, and almost all self-funded plans would be abruptly exposed to a panoply of state laws from which they have long-been immune. Simply stated, the landscape of employer benefits would be upturned overnight. This Court should either avoid this argument given Oklahoma's waiver or deny it out of hand.

Finally, while the government affirms that the AWP provision is preempted under Medicare Part D, thereby properly resolving this question on the merits, it curiously suggests that the scope of the underlying Part D preemption standard need not be explicated. But because this case cleanly presents that issue, this Court should expound upon the breadth of the Part D standard. This would provide further clarity for states, government agencies, Part D sponsors, and the public, thereby supporting Congress's intent that preemption deter state meddling in an area of exclusive federal concern.

## II. The Act is Preempted by ERISA as Applied to Self-Funded Plans and Their Third-Party Administrators

### a. The United States correctly applies the ERISA "connection with" standard to the AWP Provision, Retail-Only Pharmacy Access Standards, and Cost-Sharing Discount Prohibition.

The United States correctly applies the ERISA "connection with" standard to the AWP Provision (36 O.S. § 6962(B)(4)), Retail-Only Pharmacy Access Standards

(36 O.S. § 6961(A)-(B)), and Cost-Sharing Discount Prohibition (36 O.S. § 6963(E)). As the United States recognizes, these provisions dictate "where and under what cost-sharing terms participants can obtain covered prescription drugs." U.S.Br. at 12; Aplt.Br. at 25-30. These provisions prescribe what pharmacies need to be included and the cost-sharing terms for network pharmacies—choices integral to plan structure and benefit design. U.S.Br. at 12. Furthermore, by restricting the shape and terms of a plan's provider networks, the challenged provisions interfere with nationally uniform plan administration by requiring plans to adopt different coverage in Oklahoma than in other states. U.S.Br. at 13; Aplt.Br. at 40-41.

As PCMA argues and the United States agrees, "connection with" preemption is not reserved for those state laws that bind ERISA plans to only one choice. U.S.Br. at 14. Rather, state laws that foreclose *any* choice concerning the substance of plan benefits have a "connection with" ERISA, even if plans retain some flexibility of choice. *Id*.; Aplt.Br. at 23. In addition, the United States squarely rejects the argument proffered by Oklahoma and its supporting amici that states may escape a "connection with" ERISA by directing their laws at PBMs rather than ERISA plans. *See* U.S.Br. at 15-16 ("[E]ven if the Act were construed to regulate only third-party PBMs, that would not eliminate the 'connection with' ERISA plans."). Recognizing the operational analysis employed in ERISA preemption jurisprudence and unrebutted facts regarding the ubiquity and need for PBMs, the United States

remarked that "[b]ecause PBMs manage benefits on behalf of plans, a regulation of PBMs 'function[s] as a regulation of an ERISA plan itself.'" *Id*. at 16 (citing *PCMA v. Wehbi*, 18 F.4th 956, 966 (8th Cir. 2021)); Aplt.App. at 398-99. As PCMA has pointed out, "for most if not all" ERISA plans, managing a pharmacy benefits plan without a PBM "is a practical impossibility." Aplt.App. at 718 (quoting *PCMA v. District of Columbia*, 613 F.3d 179, 188 (D.C. Cir. 2010)); Aplt.Br. at 6. PBMs play a key role in core aspects of plan design and administration. Therefore, the Court should reject Oklahoma's argument that states can avoid an impermissible connection with ERISA by regulating PBMs rather than plans. U.S.Br. at 16-17.

      b.  <u>The United States misapplies the correct legal standard to the Probation-Based Pharmacy Limitation and misunderstands the facts.</u>

The United States admits, as it must, that the Probation-Based Pharmacy Limitation "eliminates one possible basis for excluding a pharmacy from a PBM's network (i.e., a pharmacist's probation status)." However, its conclusion that the elimination of this plan design option is somehow "*de minimis*" is plainly wrong on the facts and distorts the applicable legal standard.

The government is first wrong on the facts: The Probation-Based Pharmacy Limitation does not have a "*de minimis*" impact. Rather, it forbids network terms and conditions that would allow removal of network pharmacies based on the probation status of its pharmacists. It thereby employs an intrusive means to regulate provider network design and structure that is even more far-reaching than the closely

associated AWP Provision. Whereas the AWP Provision commands that plans and PBMs include any provider in its preferred network (or standard network), so long as that provider is willing to satisfy the terms and conditions for network participation, the Probation-Based Pharmacy Limitation goes one step further by dictating those specific terms and conditions. Indeed, the terms and conditions of network participation—which define not only who may participate in the network, but also *why*—are integral to network design, which, in turn, is a fundamental aspect of benefit design. Such regulation manifestly limits plan choices in the design of their ERISA-covered benefits and is therefore preempted. *Shaw v. Delta Air Lines*, 463 U.S. 85, 97 (1983).

Plans rely on PBMs to ensure that plan members have safe access to prescription drugs. Aplt.App. at 510, 514. One way PBMs do so is by setting network participation terms that allow a plan to remove pharmacies based on pharmacists' probation status under state law. *Id.* Removal of this term would undermine a plan's quality standards. Pharmacists can be suspended for fraud, drug redirection, or other misconduct. *Id.* at 522. This is not just theoretical. The State's own expert witness, a member of the Oklahoma Board of Pharmacy, admits to putting pharmacists on probation for a myriad of safety issues, including: diversion, patient harm, and dispensing a controlled substance without a prescription. Aplt.App. at 586-87. The

United States' claim that altering the quality-of-care terms and conditions of network participation is "*de minimis*" overlooks the facts.

These real-world impacts of the Probation-Based Pharmacy Limitation are exacerbated by AWP laws, including the AWP Provision that independently has an impermissible connection with ERISA in this case. Put together, such laws force plans to accept any providers willing to meet the terms and conditions of the plan *and* dictate those very terms and conditions. Indeed, to the extent plans devise stricter terms and conditions to preserve some semblance of limited networks, laws dictating terms and conditions further straitjacket plans over provider network structure, an area long recognized as a core ERISA plan prerogative.[1] The United States agrees that AWP laws have a "connection with" ERISA because they limit plan decisions on where participants may go to receive covered drugs. U.S.Br. at 12; *see also Rutledge v. PCMA*, 141 S. Ct. 474, 482 (2020). That legal analysis is equally controlling with respect to terms and condition laws like the Probation-Based Pharmacy Limitation.

---

[1] Allowing states to dictate the terms of network participation could have significant impacts. Terms of network participation often include requirements for medication storage (such as temperature control), adequate inventory, shipping or delivery of medications, trainings to identify victims of abuse, anti-discrimination, anti-counterfeit programs, hours of operation, and disaster cooperation. These terms can be particularly important for specialty pharmacy networks, ensuring that only those with appropriate resources dispense expensive, high-touch medications. State restrictions on the terms of network participation would similarly impact medical benefit plans, which also include terms to ensure quality, safety, and efficacy of care.

The government is also wrong on the law: ERISA preemption doctrine has no exception for laws dictating benefit design based on the extent of their impact. In fact, any state law restricting terms of provider network participation interferes with plan design and nationally uniform plan administration and is therefore preempted. Aplt.R.Br. at 16. Indeed, as the United States acknowledges, a state law would still have the "relevant 'connection with' ERISA plans even if plans retain some residual flexibility." U.S.Br. at 14. Thus, the corollary of the governments' determination that the provision "eliminates one possible basis for excluding a pharmacy from a PBM's network" is that it has an impermissible "connection with" ERISA. This is regardless of the magnitude of the restriction, as a state law need not leave the plan with only one choice for it to be preempted. U.S.Br. at 14.

No federal court has recognized a *de minimis* exception to the question of whether a state law impacts benefit design. The Supreme Court has recognized that ERISA plans need not demonstrate the magnitude of a harm where a state law regulates core areas of ERISA concern. In *Gobeille v. Liberty Mut. Ins. Co.*, the Court rejected the state's argument that the plan failed to demonstrate that the challenged state-imposed reporting regime caused it to suffer economic costs. The Court noted that the key point was not the extent "of economic burdens caused by the state law" but instead that it "regulates a central aspect of plan administration and, if the scheme is not pre-empted, plans will face the possibility of a body of

8

disuniform state reporting laws." 577 U.S. 312, 324 (2016). The Court reached this conclusion for good reason: it would transform the question of whether a state law impacts benefit design or plan administration, by injecting a separate sub-inquiry into the extent of such impact, as measured by its economic effects. Such a reworking of the basic "connection with" standard would reduce the predictability of ERISA preemption and expand the administrative difficulties and litigation costs borne by employers. *See FMC Corp. v. Holliday*, 498 U.S. 52, 65 (1990). (ERISA was intended, in part, to reduce "administrative difficulties" and "avoid endless litigation over the validity of State action" that could "lead to employee benefit plans' expenditure of funds in such litigation") (internal quotations omitted).

In contrast, the United States appears to have conflated the separate criterion applied by courts analyzing "cost regulations" with the unequivocal requirement that laws dictating substantive benefit design are preempted. As noted in *Travelers*, a cost regulation, while typically permitted under ERISA, can nonetheless be subject to preemption where its indirect economic effects "produce such acute, albeit indirect, economic effects… as to force an ERISA plan to adopt a certain scheme of substantive coverage[.]" *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co*., 514 U.S. 645, 668 (1995). But in so ruling, the Court in *Travelers* emphasized that this assessment of the magnitude of the harm would not

9

apply in instances where state laws by their terms "mandate[] employee benefit structures" (like the Probation-Base Pharmacy Limitation here). *Id.* at 658.

The only basis of support the United States cites for its contrary conclusion is that the Eighth Circuit in *Wehbi* found a provision that prohibited conditioning network participation on certain accreditation standard requirements did not regulate a central matter of plan administration. 18 F.4th at 968. But, the Eighth Circuit did not assess that law's effects on the structure of the provider network and connected effect on plan design. *Id.* Instead, the Eighth Circuit treated the law as a cost regulation, by assessing the magnitude of its economic effects and the degree to which it could impact plan administration. For this reason, the Eighth Circuit's ruling on the accreditation provision in *Wehbi* is improper.

In contrast to the Eighth Circuit, the Fifth Circuit properly resisted a state's request to apply the *Travelers* cost-regulation standard to state laws dictating network design. In *CIGNA Healthplan v. Louisiana ex rel. Ieyoub*, the Fifth Circuit rejected Louisiana's claim that the *Traveler*'s cost-regulation standard applied to an AWP provision, stating: "the Louisiana statute does not merely raise the costs of the implicated benefits; it delineates their very structure. As such, the statute falls outside the purview of the limited *Travelers* holding: The Court there repeatedly recognized that ERISA preempts state laws that mandate employee benefit structures." 82 F.3d 642, 649 (5th Cir. 1996) (internal quotation omitted). Because—

10

as the United States acknowledges—the Probation-Based Pharmacy Limitation "eliminates one possible basis for excluding a pharmacy from a PBM's network," and thus mandates benefits structures, U.S.Br. at 10, the *Travelers* standard is equally inapplicable here, and the government should have concluded that an impermissible "connection with" ERISA existed.

        c.  <u>The Saving Clause and the Deemer Clause provide no refuge to Oklahoma.</u>

Having acknowledged that the Act "relates to" ERISA-covered benefit plans, the United States asserts, essentially in passing, that the Act is saved from preemption by ERISA's Saving Clause and the so-called Deemer Clause permits limitless indirect regulation of ERISA plans through regulation of their third-party administrators ("TPAs"), including PBMs. U.S.Br. 21-22 & n.4. This position is a shocking departure from settled ERISA preemption doctrine and, if adopted, would threaten the viability of ERISA preemption altogether, imply that countless ERISA preemption cases have been wrongly decided, and subject self-funded medical, dental, and other benefit plans to numerous state laws from which they have long been immune. Any such contention, under ERISA's Saving and Deemer Clauses, was long ago forfeited by Oklahoma and should be deemed waived. Even if it were appropriate for review, the Court should reject the United States' newfangled argument by confirming that the challenged portions of the Act are preempted by

ERISA, at minimum as applied to *all* self-funded plans, including the overwhelming majority that engage TPAs.

> i.    *Oklahoma has not argued that the Saving or Deemer Clauses apply.*

As a preliminary matter, this litigation has been pending for three years, and in that time, Oklahoma has never argued that the challenged state statute is a law "which regulates insurance" within the meaning of the Saving Clause or that the Deemer Clause impedes preemption for most self-funded plans. Oklahoma's abandonment of a Saving Clause defense speaks for itself; and whatever strategy underlies it, it should bind the state. Accordingly, this Court should hold that Oklahoma has long since waived these arguments that are only now being raised by the United States as third-party amici.[2] *See San Juan Cty. v. United States*, 503 F.3d 1163, 1210 (10th Cir. 2007) ("The principal difference between party and amicus status is that only parties ordinarily have the right to raise new issues[.]"); *Wyo. Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1230 n.2 (10th Cir. 2000) (refusing to consider new arguments raised by amici).

---

[2] In its motion for summary judgment, Oklahoma made no mention of the Saving Clause and relegated its sole reference to the Saving Clause to a footnote in its opposition to PCMA's motion for summary judgment. Aplt.App. at 696. The Saving Clause received the same treatment in Appellee's brief before this Court. *Bimbo Bakeries USA, Inc. v. Sycamore,* 39 F.4th 1250, 1257 n.1 (10th Cir. 2022) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived."). There is no mention of the Deemer Clause in any of Oklahoma's prior briefings.

    *ii.*    *The Saving Clause permits states to regulate insurance, but the Deemer Clause exempts self-funded plans from that carveout.*

Assuming *arguendo* that the Saving and Deemer Clauses are on the table, they do not accomplish what the United States says they do.

Broadly speaking, there are two categories of ERISA-covered healthcare benefit plans: (1) "fully insured" plans and (2) "self-funded" (or "self-insured") plans. Sponsors of fully insured plans purchase third-party group health insurance policies to cover their employees; they typically subsidize or pay for the entire premium, but they do not assume the risk of loss on the insurance policy. By contrast, sponsors of self-funded plans pool risk and collect premiums themselves. Self-funded plans are liable for their own losses, which are paid out from the assets of their fund and therefore are often viewed as "uninsured." At the same time, self-funded plans engage TPAs (including PBMs for prescription drug benefits) as agents to assist with the details of plan design and administration on their behalf.

In fashioning ERISA's preemption regime, Congress was concerned that health insurance companies selling commercial policies to fully insured ERISA-covered benefit plans might assert that state regulation of their insurance businesses is preempted. *See* H.R. Rep. No. 94-1785, at 48 (1977). Because independent third-party insurance policies "are not established or maintained by" ERISA-covered plans themselves, and because state-law regulation of the business of insurance is a matter of local importance, 15 U.S.C. § 1011, Congress added the Saving Clause to

clarify that general state-law regulation of insurance is *not* preempted, even when insurance is sold to an ERISA-covered plan. H.R. Rep. No. 94-1785, at 48 (1977).

To that end, the Saving Clause specifies that ERISA's preemption clause "shall [not] be construed to exempt or relieve any person from any law of any State which regulates insurance[.]" 29 U.S.C. § 1144(b)(2)(A). According to this language, an "insurance company is therefore not relieved [by ERISA's preemption clause] from state insurance regulation." *FMC Corp.*, 498 U.S. at 61.

At the same time, Congress was concerned that states might "deem" self-funded ERISA benefit plans to be commercial insurers and attempt to regulate them by way of the Saving Clause. This would defeat the central point of ERISA preemption, which "was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 141 (1990). Indeed, if the Saving Clause were invoked to allow regulation of self-funded plans as private insurers, it would essentially swallow ERISA's preemption clause whole.

Accordingly, Congress added the Deemer Clause, which provides in relevant part that no self-funded ERISA-covered benefit plan "shall be deemed to be an insurance company or other insurer" for purposes of the Saving Clause. 29 U.S.C. § 1144(b)(2)(B). In other words, the Deemer Clause exempts "self-funded ERISA plans from state laws that 'regulate insurance' within the meaning of the saving

clause." *FMC Corp.*, 498 U.S. at 61. Crucially, "the language of the deemer clause . . . [is] either coextensive with or broader, not narrower, than that of the saving clause." *Id.* at 64. Thus, any state law that *would be* preempted were it not for the Saving Clause necessarily *becomes* preempted as applied to a self-funded plan under the Deemer Clause. That is to say, "if a plan is [fully] insured, a State may regulate it indirectly through regulation of its insurer and its insurer's insurance contracts; [but] if the plan is uninsured," meaning self-funded, "the State may not regulate it" in an otherwise preempted manner. *Id.*

The resulting rule is simple: If an ERISA-covered benefit plan contracts with a third-party to bear the plan's insurance risk, the state can regulate the plan indirectly by regulating the plan's insurer under the Saving Clause—but, under the Deemer Clause, the state may not otherwise regulate self-funded ERISA plans, whether directly or indirectly. *See, e.g.*, *Metropolitan Life v. Mass.*, 471 U.S. 724, 747 (1985).

        iii.    *The United States' unprecedented reading of the Deemer Clause must be rejected.*

The United States offers a far narrower view of the Deemer Clause, claiming it exempts from the Saving Clause only a state's regulation of "the plan's own conduct." U.S.Br. at 21. But taking this position to its logical conclusion would mean that there is no analytical difference for Saving Clause purposes between a plan that

purchases third-party insurance and a plan that self-insures but contracts for third-party administrative services (such as with a PBM). Because the overwhelming majority of self-funded ERISA plans contract with TPAs, the United States' position would effectively gut the Deemer Clause of all force. *See* Patricia M. Danzon, Testimony before U.S. Dep't of Labor, 2014 ERISA Advisory Council, *PBM Compensation and Fee Disclosure*, at 3 (June 19, 2014). State laws that dictate substantive plan design (as the challenged provisions do) could never be subject to ERISA's preemptive effect—thereby permitting unlimited "indirect" regulation of ERISA-covered plans regardless of whether they are self-funded or fully insured.

There is no warrant in ERISA's text, structure, or purpose to construe the Deemer Clause so narrowly. For its part, the United States offers zero explanation or legal authority to support this radical position, apart from its cursory assertion, in a footnote, that Eighth Circuit precedent on this point is inconsistent with Supreme Court case law. Unsurprisingly, therefore, all the cases that have addressed this issue, whether explicitly or implicitly, have uniformly held that the Deemer Clause applies to prevent state regulation of self-funded plans, whether directly or indirectly through their TPAs.

***Statutory text and purpose.*** As explained above, while the Saving Clause excludes general-insurance regulation from ERISA preemption's scope, the Deemer Clause clearly states that self-funded plans shall not be "deemed to be an insurance

16

company… or engaged in the business of insurance" for purposes of any state law falling under the Saving Clause. 29 U.S.C. § 1144(b)(2)(A)-(B). The Deemer Clause makes no mention of any distinction between self-funded plans that engage a TPA to administer those self-funded benefits and those that self-administer. *Id.*

In addition, the government's position is badly out of step with the purpose of both the Deemer Clause specifically, and ERISA's preemption scheme more broadly. *See United States v. Elliott*, 937 F.3d 1310, 1315 (10th Cir. 2019) (the "tools of interpretation include examination of the statute's . . . purpose[.]") (internal quotation omitted). Of course, a court "cannot interpret federal statutes to negate their own stated purposes." *Exby-Stolley v. Bd. of Cnty. Commissioners*, 979 F.3d 784, 798 (10th Cir. 2020) (internal quotations omitted).

Adoption of the government's position here would expand the Saving Clause's reach to virtually all self-funded plans, creating precisely the kind of rule-swallowing exception to ERISA preemption that motivated Congress to adopt the Deemer Clause in the first place.

While around 30% of large employers offer drug benefits through fully insured plans, the majority (approximately 65%) offer self-funded benefits instead. *See* Danzon, Testimony before U.S. Dep't of Labor, at 3. And essentially all self-funded plans contract with PBMs to design and administer their benefits. *Id.*; Aplt.App. 504-05, 509, 535 ("self-funded … employee health plans lack the

expertise to administer their pharmacy benefits in house . . . ."), 543-44 ("[many ERISA] plans are incapable of handling [administration of benefits] on their own"). The use of TPAs is similarly ubiquitous among self-funded medical, dental, and other benefits plans. *See* Kaiser Family Foundation, *2018 Employer Health Benefits Survey* (Oct. 3, 2018) ("self-funded plans typically contract with [TPAs]"). In other words, the universe of self-funded, self-administering benefit plans is essentially a null set.

If the United States' position— that the Deemer Clause prohibits states from adopting insurance regulations that apply to ERISA plans directly, but allows states to accomplish the same objectives by regulating ERISA plans indirectly through their TPA— were accepted, then the Deemer Clause would accomplish nothing, and the Saving Clause would eclipse ERISA's preemption clause entirely. The scope of such a ruling would logically extend to the countless state laws regulating health insurers, *see Mullenix v. Aetna Life & Cas. Ins. Co*., 912 F.2d 1406, 1413 (11th Cir. 1990), and would open ERISA self-funded plans to extensive state regulation from which they have been exempt for nearly 50 years. Moreover, given the extraordinary variability in state insurance laws, this position would invite the "patchwork

scheme," of state regulation that Congress set out to prevent with ERISA preemption. *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11 (1987).[3]

**Supreme Court precedent.** The Saving and Deemer Clauses have long been read to provide that "if a plan is [fully] insured, a State may regulate it indirectly through regulation of its insurer and its insurer's insurance contracts; [but] if the plan is uninsured," meaning self-funded, "*the State may not regulate it*" in an otherwise preempted manner. *FMC Corp.*, 498 U.S. at 64 (emphasis added). Or as the Supreme Court put it earlier in *Metropolitan Life*, the Deemer Clause created a "distinction between insured and [self-funded] plans, leaving the former open to indirect regulation *while the latter are not*." 471 U.S. at 747 (emphasis added); *see also UNUM Life Ins. Co. v. Ward*, 526 U.S. 358, 367 n.2 (1999) ("Self-insured ERISA plans . . . are generally sheltered from state insurance regulation."). By contending that the Saving Clause permits state insurance laws that manifestly regulate self-funded plans, the United States simply ignores the plain language and design of the Deemer Clause as interpreted in longstanding and binding Supreme Court precedent.

In a half-hearted bid to support its purpose-destroying interpretation, the United States asserts that *Rush Prudential HMO v. Moran*, 536 U.S. 355 (2002)

---

[3] The United States suggests that a "fact-specific" inquiry regarding whether a particular self-funded plan's actions are implicated by a state law. *See* U.S.Br. at 22 n.5. If adopted, this rule would be unworkable and create significant uncertainty for self-funded plans regarding their compliance with state laws.

19

limits the Deemer Clause to "direct" regulation of self-funded plans, permitting "indirect" regulation of self-funded plans by regulating their TPAs. U.S.Br. at 21 n.4. In fact, *Rush Prudential* stands for the exact opposite proposition. The law at issue there applied only to risk-bearing HMOs contracting with plans, which the government itself described as fully insured. *See* U.S. Amicus Br. 12 n.5, *Rush Prudential*, No. 00-1021 (2001). And that was the Court's conclusion too—that "HMOs [are] risk-bearing organizations" and that, by contracting with a risk-bearing HMO, a plan is insured. *Rush Prudential*, 536 U.S. at 359, 372. As such, the Deemer Clause simply was not implicated in that case and the Saving Clause undeniably applied by itself. Nonetheless, the Court clarified that the act "would *not* be 'saved' as an insurance law to the extent it applied to self-funded plans." *Id.* at 371-72 & n.6 (emphasis added). The Court thus reiterated what it had twice before held: indirect regulation of fully insured plans is permissible, while indirect regulation of self-funded plans is not.

> ***Precedent of other federal courts.*** Against this background of 30 years of consistent Supreme Court precedent, it should come as no surprise that every lower federal court that we are aware of that has considered the United States' approach to the Deemer Clause has roundly rejected it.

> The Eleventh Circuit held in *America's Health Insurance Plans v. Hudgens*, that ERISA preempted a Georgia law requiring prompt pay of claims by self-funded

plans *and* their TPAs. 742 F.3d 1319, 1333 n.18 (11th Cir. 2014). The court rejected the defendant's argument that the Deemer Clause was inapplicable because the law operated only indirectly by regulating TPAs. *Id.* Relying on *FMC Corp.*, the court held that "[Defendants'] position ignores the fact that TPAs would be acting pursuant to the underlying self-funded ERISA plans. *Whether direct or indirect*, state insurance regulation of [self-funded] ERISA [plans] is not allowed by operation of the Deemer Clause," even when accomplished through regulation of TPAs. *Id.* (emphasis added); *see also Mullenix*, 912 F.2d at 1413 (state law requiring coverage of chiropractic services preempted by ERISA as applied to TPA of self-funded plan due to the Deemer Clause).

Similarly, the Eighth Circuit in *Prudential Insurance Company of America v. National Park Medical Center*, held that an Arkansas AWP law, which applied only to self-funded plans indirectly by regulating the provider networks of the plan's TPA was preempted by ERISA under the Deemer Clause. 413 F.3d 897, 912 (8th Cir. 2005). Citing *Rush Prudential*, *FMC Corp.*, and *Metropolitan Life*, the Eighth Circuit remarked that the Supreme Court "has noted repeatedly that because of the deemer clause, statutes that *indirectly* regulate self-funded ERISA plans are not saved from preemption to the extent such statutes apply to self-funded plans." *Id.* (emphasis added); *see also Daley v. Marriott Int'l, Inc.*, 415 F.3d 889, 891 (8th Cir.

2005) ("because of the deemer clause, the Nebraska mental-health parity law cannot regulate the Plan indirectly through [its TPA.]").

Other courts have reached the same conclusion, whether explicitly or as a matter of course. The Western District of Texas has explained, for example, that, "[w]hen the self-funded ERISA plan is the insurer, or risk-bearer, then the state statute is preempted by virtue of the 'deemer clause.'" *NGS Am., Inc. v. Barnes*, 805 F. Supp. 462, 473 (W.D. Tex. 1992). That is so even when the law "regulate[s] a third-party administrator of a self-funded ERISA plan," which, when so applied, does "not regulate the business of insurance but [rather] 'relate[s] to' a self-funded ERISA plan." *Id.*; *Am. Med. Sec. v. Bartlett*, 111 F.3d 358, 360 (4th Cir. 1997) (Deemer Clause applicable where TPA was defendant); *Bill Gray Enters. v. Gourley*, 248 F.3d 206, 215 (3d Cir. 2001) (plan administered by third-party claims processer protected by Deemer Clause when purchasing stop-loss reinsurance). Given the long-recognized distinction between fully insured and self-funded ERISA plans, a staggering number of federal ERISA decisions, including many that did not address the precise Deemer Clause argument presented here, have reached conclusions that would nevertheless be upended by the government's position.[4]

---

[4] *See, e.g.*, *Gonzalez v. Prudential Ins. Co. of America*, 901 F.2d 446, 453 (5th Cir. 1990) (self-insured ERISA plans are not subject to direct or indirect state insurance regulation); *Howard v. Parisian, Inc.*, 807 F.2d 1560, 1563 (11th Cir. 1987) (ERISA preempts state laws that "apply to employee benefit plans even if those laws … amount only to indirect regulation of such plans."); *Moore v. Provident*

To the extent the United States means to suggest that by hiring a PBM, a self-funded plans loses its status as a self-funded entity, that is flat wrong. As long as plans do not shift their risk to a third-party insurer, they remain self-funded and entitled to ERISA preemption under the Deemer Clause. *See*, *e.g.*, *Gourley*, 248 F.3d at 215 (considering the Deemer Clause in the context of stop loss); *Bartlett*, 111 F.3d at 360 (same); *Lincoln Mut. Cas. Co. v. Lectron Prod., Inc.*, *Employee Health Benefit Plan*, 970 F.2d 206, 210 (6th Cir. 1992) (same). PBMs are not risk-bearing entities and do not take on the financial liabilities of plans.

In sum, the United States is correct that the Act bears an impermissible connection with ERISA-covered plans. Because Oklahoma long ago abandoned any Saving Clause defense, the Court need go no further to reverse. But even if the Court were to look past the State's waiver, the Deemer Clause would apply, excepting from the Saving Clause the Act as applied to self-funded plans.[5]

---

*Life Insurance*, 786 F.2d 922, 927 (9th Cir. 1986) (finding state tort claims preempted because plan was self-insured and TPA never acted as an insurer for the plan).

[5] With due respect to the United States, this question is not a close one, and the Court should reject the government's eleventh-hour Saving Clause and Deemer Clause arguments out of hand, on their merits. But if the Court were inclined to entertain seriously the United States' arguments on this score, a vacatur and remand to the district court would be warranted. The troubling practical implications of the government's newfound position— which would upend nearly 50 years of ERISA jurisprudence and subvert settled industry expectations— cannot be overstated, and before the Court gives it serious credence, the parties should have an opportunity to fully air the issues in complete, adversarial briefing before the district court.

### III.    The Act Interferes with Medicare Part D Standards and is Preempted

The United States correctly states that the Medicare statute preempts the Act's AWP Provision as applied to Part D plans. While the United States avoids explication of the proper preemption standard, this Court should not hesitate to do so. The Medicare express preemption provision does not require the existence of a specific overlapping federal Part D standard for a state law to be preempted. Indeed, the plain language and legislative history of the provision demonstrate that Congress intended to preempt the entire field of Medicare Part D. Recent judicial precedent confirms that state laws with respect to Medicare Part D plans are preempted even when the state law regulates areas where CMS is authorized to act but has chosen not to.

a.    <u>This Court should define the standard for Medicare preemption consistent with the plain language, legislative history, and law in other circuits.</u>

Congress has clearly and intentionally enacted a broad express preemption provision that preempts nearly all state regulation of Part D plans. Aplt.Br. at 44-47. Federal law preempts not only those state laws that intrude on areas where CMS has spoken, but also those areas where Congress authorized CMS to act, but CMS has remained silent. *See* H.R. Rep. No. 108-391 at 557 (2003) (Conf. Rep.) (Medicare Part C and D are purely "federal program[s] operated under Federal rules," as to which "[s]tate laws, do not, and not apply"). Indeed, many courts have held that the

24

language of the Medicare preemption standard is broad and preempts beyond those laws that *conflict* with Medicare standards. *Medicaid & Medicare Advantage Prods. Ass'n of P.R., Inc. v. Hernández*, 58 F.4th 5, 12 (1st Cir. 2023); *see also Wehbi,* 18 F.4th at 971 ("the 2003 amendment . . .expand[ed] the scope of express Medicare preemption from conflict preemption to field preemption.").

A recent First Circuit decision adopts this view. In considering a Puerto Rico law requiring Medicare Advantage[6] plans to "compensate healthcare providers in Puerto Rico at the same rate as providers are compensated under traditional Medicare," the court found Puerto Rico's argument –identical to Oklahoma's here – that Medicare preemption requires "specific, overlapping federal standard[s]" "legally unavailing." *Hernández*, 58 F.4th at 13.

Instead, the First Circuit concluded that "State laws that *in any way* relate to Medicare [] 'standards' are 'presumed to be preempted unless they relate to licensure or solvency.'" *See id*. As the First Circuit makes clear, the preemption clause's use of the "modifying term 'any' before 'State law or regulation' and the inclusion of two listed exceptions" suggests that Congress intended for all state laws or

---

[6] Medicare Advantage and Medicare Part D share the same preemption clause. Aplt.Br. at 44-45. In both Medicare Part D and Medicare Advantage, CMS contracts with private organizations – the Part D Sponsor or the Medicare Advantage Organization ("MAO") – who negotiate payment and network-inclusion terms with healthcare providers. *Id*. at 8.

regulations that purport to regulate [Medicare Advantage or Part D] plans offered by [MAOs or Part D sponsors]… to be preempted." *Id.* at 12-13 (internal quotations omitted). Thus, Medicare preemption "sweeps broadly" and any state law regulating Part D plans is "superseded" if it falls within the areas of regulation where CMS has been tasked by Congress with setting standards. *Id.*

Notably, the *Hernández* court articulated the full breadth of Medicare preemption before reaching the conclusion that the Puerto Rico law was ultimately inconsistent with federal Medicare standards. *See id.* at 12-14. Likewise, this Court should not hesitate to describe the well-established Medicare preemption standard before applying that standard to the facts of this case. Notwithstanding the obvious conflict between the Act and Part D, states, Medicare Part D plans, and the public would benefit from this Court providing clarity like that articulated by the First Circuit.

> b. In finding the AWP Provision to be preempted under Part D, the United States adopts a field preemption approach.

While the United States does not articulate a Medicare preemption standard, its rationale for preemption of the AWP Provision is akin to a field preemption inquiry. The analysis focuses on what CMS chose to refrain from regulating, pointing to CMS' rejection of a proposal to require plans to allow any willing pharmacy to participate in their networks as a preferred pharmacy. U.S.Br. at 22-24. When CMS made the deliberate decision to reject this proposal, it pointed to

26

Medicare regulations which allow Part D plans "to reduce cost-sharing differentially for network pharmacies." *Id.* at 23 (citing 70 Fed. Reg. at 4254). CMS concluded that the Medicare AWP regulation struck the correct balance, and thus chose to require pharmacy access only to standard networks. *Id.*

CMS's choice to refrain from imposing an AWP standard on preferred networks demonstrates that CMS had the authority to impose such a standard and chose not to do so. *Id.* at 23. Thus, under the United States' rationale, Part D controls the field including those areas where Part D standards are silent. Therefore, while the question of whether the AWP Provision is preempted is easily answered, so, too, is the question of what standard applies: "[s]tate laws, do not, and should not apply" to Part D plans within the field of regulation set aside by Congress for CMS. *See* H.R. Rep. No. 108-391, at 557 (2003) (Conf. Rep.), reprinted in 2003 U.S.C.C.A.N. 1808, 1926.

## IV.  Conclusion

The Court should reverse and remand with instructions to enter judgment for PCMA with respect to the challenged provisions.

Respectfully submitted by,

PHARMACEUTICAL CARE
MANAGEMENT ASSOCIATION

By its attorneys,

27

Dated: April 17, 2023

/s/ Dean Richlin
Dean Richlin
Kristyn DeFilipp
Andrew London
Foley Hoag LLP
155 Seaport Blvd.
Boston, MA 02210
Phone: (617) 832-1000
Fax: (617) 832-7000
drichlin@foleyhoag.com
kbuncedefilipp@foleyhoag.com
alondon@foleyhoag.com

Joel W. Harmon
Oklahoma Bar #11332
Mary H. Tolbert
Oklahoma Bar #17353
Crowe & Dunlevy
Braniff Building
324 N. Robinson Ave., Ste. 100
Oklahoma City, OK  73102
Phone: (405) 239-5414
Fax: (405) 272-5923
joel.harmon@crowedunlevy.com
molly.tolbert@crowedunlevy.com

## CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME-LIMIT, TYPEFACE REQUIREMENT, AND TYPE STYLE REQUIREMENTS

1.      This document complies with the 6,500 word limit of Fed. R. App. P.

32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P.

32(f) this document contains 6,499 words.

2.      This document complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)

because: this document has been prepared in a proportionally spaced typeface

using Word for Microsoft Office 365 in 14-Point font, Times New Roman.

*/s/ Andrew London*
Andrew London

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2023, I electronically transmitted the

attached document to the Clerk of the Court using the Electronic Case Filing

System for filing. Based on the records currently on file in this case, the Clerk will

transmit a Notice of Electronic Filing to those registered participants of the ECF

System.

*/s/ Andrew London*
Andrew London