No. 22-6074

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION,

*Plaintiff-Appellant,*

v.

GLEN MULREADY, in his official capacity as Insurance Commissioner of Oklahoma, and OKLAHOMA INSURANCE DEPARTMENT,

*Defendants-Appellees.*

On appeal from the United States District Court
for the Western District of Oklahoma
The Hon. Bernard M. Jones
No. 5:19-cv-977-J

## APPELLEES' RESPONSE TO THE UNITED STATES

GARRY M. GASKINS, II
  *Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
garry.gaskins@oag.ok.gov

*Counsel for Defendants-Appellees*

ZACH WEST
  *Director of Special Litigation*
WILL FLANAGAN
  *Assistant Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
zach.west@oag.ok.gov
william.flanagan@oag.ok.gov

*Counsel for Defendants-Appellees*

## TABLE OF CONTENTS

**Table of Authorities** ...............................................................................iii

**Introduction** ...........................................................................................1

**I. The Pharmacy Choice Act's provisions are not preempted by ERISA.** ...........2

    A. The United States' "connection with" analysis conflicts with its positions in *Rutledge* and the Supreme Court's *Rutledge* opinion. ............................................3

    B. The United States' "connection with" analysis fails on its own terms. .........12

    C. The Pharmacy Choice Act applies only to PBMs, and PCMA does not have standing to argue otherwise. ................................................13

    D. Oklahoma has not waived any reliance on the ERISA savings clause, which likewise supports affirmance here. ....................................16

**II. The Pharmacy Choice Act's Any-Willing-Provider provision is not preempted by Medicare Part D.** .................................................18

**Conclusion** ...........................................................................................24

**Certificate of Compliance** ....................................................................26

**Certificate of Digital Submission** ........................................................26

**Certificate of Service** ...........................................................................26

## TABLE OF AUTHORITIES

**Cases**

*CSX Transp. v. Easterwood,*
  507 U.S. 658 (1993) ............................................................................22

*Day v. SkyWest Airlines,*
  45 F.4th 1181 (10th Cir. 2022) .........................................................16

*Dep't of Consumer Affairs v. Isla Petroleum Corp.,*
  485 U.S. (1988) ...................................................................................22

*FMC Corp. v. Holliday,*
  498 U.S. 52 (1990) ................................................................................6

*Geier v. American Honda Motor Co.,*
  529 U.S. 861 (2000) ............................................................................21

*Gobeille v. Liberty Mut. Ins.,*
  577 U.S. 312 (2016) ............................................................................10

*Gregory v. Ashcroft,*
  501 U.S. 452 (1991) ....................................................................... 19, 22

*H.P. Welch Co. v. New Hampshire,*
  306 U.S. 79 (1939) ..............................................................................22

*Hillsborough Cty. v. Automated Med. Labs., Inc.,*
  471 U.S. 707 (1985) ............................................................................19

*Hunt v. Wash. State Apple Advertising Comm'n,*
  432 U.S. 333 (1977) ............................................................................15

*Kentucky Association of Health Plans v. Miller,*
  538 U.S. 329 (2003) ............................................................................17

*Metropolitan Life Insurance Company v. Massachusetts,*
  471 U.S. 724 (1985) ......................................................................... 8, 9

*N.Y. Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995) ................................................................ 6, 7, 8

*New State Ice Co. v. Liebmann*,
285 U.S. 262 (1932) (Brandeis, J., dissenting) ............................... 23

*Pauley v. BethEnergy Mines, Inc.*,
501 U.S. 680 (1991) .......................................................................... 8

*PCMA v. Dist. of Columbia*,
613 F.3d 179 (D.C. Cir. 2010) ......................................................... 9

*PCMA v. Rowe*,
429 F.3d 294 (1st Cir. 2005) .............................................. 9, 10, 15

*PCMA v. Wehbi*,
18 F.4th 956 (8th Cir. 2021) .................................................. passim

*Rutledge v. PCMA*,
141 S. Ct. 474 (2020) .............................................................. passim

*Tafflin v. Levitt*,
493 U.S. 455 (1990) ........................................................................ 22

## Statutes

29 U.S.C. § 1144(a) ........................................................................ 16

29 U.S.C. § 1185a .......................................................................... 13

42 U.S.C. § 1395w-26 ..................................................................... 23

36 O.S. § 6960(6) .............................................................. 11, 13, 14

## Other Authorities

Erin C. Fuse Brown & Elizabeth Y. McCuskey, *The Implications Of* Rutledge v. PCMA
*For State Health Care Cost Regulation*,
HEALTHAFFAIRS, (Dec. 17, 2020) ....................................................... 3

Margaux Hall et al., *Rutledge vs. PCMA: The future of state regulation of pharmacy benefit managers in the wake of the SCOTUS decision*, PRACT. INSIGHTS COMMENTARIES (June 25, 2021) ..........................................................3

**Rules**

42 C.F.R. § 423.505(b)(18) ..........................................................................18, 19, 24

70 Fed. Reg. 4194, 4278 (Jan. 28, 2005).................................................... 22, 24

83 Fed. Reg. 16,440, 16,598 (Apr. 16, 2018) ....................................................19

## Introduction

On four out of the five issues in this appeal, the United States and Oklahoma agree: The challenged provisions are enforceable against pharmacy benefit managers (PBMs). The United States and Oklahoma take different routes to that conclusion, but the result is the same. As PBMs comprise the only plaintiff in this lawsuit, the district court's ruling against that plaintiff should be affirmed for those four issues, at minimum.

That said, Oklahoma respectfully disagrees with the United States' belief that three provisions on appeal have a "connection with" ERISA. To reach that conclusion, the government inexplicably ignores much of the Supreme Court's analysis in the landmark *Rutledge v. PCMA* decision*,* and it contradicts well-reasoned arguments the United States itself made in *Rutledge*. But again, this is somewhat academic given that the United States rightly insists—as Defendants have repeatedly argued—that ERISA's savings clause applies. ERISA simply does not preempt here, one way or the other.

As to Medicare Part D, the United States is incorrect about the supposed preemption of Oklahoma's Any-Willing-Provider (AWP) provision. Citing little in support, the United States makes the baffling argument that the AWP provision is preempted by a regulation the government considered but did not enact. The myopic view that state laws are preempted when the government merely *ponders* action, if accepted, would trample on the ability of States to protect their citizens from multi-billion-dollar mega-corporations in an area of traditional state authority. For these reasons and more, this Court should affirm the district court on Medicare Part D.

1

## I.    The Pharmacy Choice Act's provisions are not preempted by ERISA.

It is now the expressed view of the United States, Oklahoma, and a bipartisan group of 34 States including California, Florida, New York, and Texas, that Oklahoma's Pharmacy Choice Act—itself passed unanimously—is enforceable against PBMs under ERISA. This comes directly on the heels of a Supreme Court decision unanimously holding that several Arkansas PBM regulations are enforceable under ERISA. And that landmark case was a direct rejection of the same Plaintiff making the same types of overbroad arguments as it is making in this case. *See Rutledge v. PCMA*, 141 S. Ct. 474 (2020). The ERISA writing is on the wall in this arena.

Here, Oklahoma agrees with the United States' *conclusion* that ERISA does not preempt applying the challenged statutory provisions to PBMs. Where Oklahoma differs is with the United States' current *reasoning* that three of the State's laws have a "connection with" and thus "relate[] to an ERISA plan." *Rutledge*, 141 S. Ct. at 479 (citation omitted). Oklahoma also disagrees with the United States' view that the "plain text" of the Act applies beyond PBMs. Regardless, this issue is irrelevant given that Plaintiff is made up solely of PBMs that lack standing to litigate ERISA preemption from beyond the PBM perspective. Finally, given the United States' reliance on ERISA's savings clause, Oklahoma will take this opportunity to expand upon its argument that the savings clause was not waived by Defendants in this proceeding. In the end, this Court should uphold the Pharmacy Choice Act under ERISA.

## A. The United States' "connection with" analysis conflicts with its positions in *Rutledge* and the Supreme Court's *Rutledge* opinion.

The United States' analysis of whether provisions of Oklahoma's Act have a "connection with" and thus relate to ERISA plans is odd, to say the least. To begin, the government focuses remarkably little on *Rutledge*, even though *Rutledge* is undeniably the critical and controlling case on ERISA preemption and PBMs. *E.g.*, *PCMA v. Wehbi*, 18 F.4th 956, 966 (8th Cir. 2021) ("While the defendants' petition was pending, the Court decided *Rutledge*, where it overturned the precedent that we had relied on to conclude that ERISA preempted the laws at issue here.").[1]

*Rutledge* was particularly influential below. The parties jointly informed the district court at one point that the then-forthcoming "decision in *Rutledge* **will substantially inform core issues**" and is "**likely to clarify the legal standards under which this present case should be evaluated**." Supp.App. at 21-22 (emphases added). When *Rutledge* thereafter issued, PCMA did not mince words about its import, bemoaning that "the Court's decision … **will result** in the unraveling of federal protections under"

---

[1] *See also, e.g.*, Erin C. Fuse Brown & Elizabeth Y. McCuskey, *The Implications Of* Rutledge v. PCMA *For State Health Care Cost Regulation*, HEALTHAFFAIRS (Dec. 17, 2020), https://www.healthaffairs.org/do/10.1377/forefront.20201216.909942/ ("Justice Sotomayor's opinion sweeps broadly …. Applying the logic of *Rutledge*, PBM laws are a form of health care cost regulation, and PBMs are not health plans … so ERISA should not preempt states' PBM regulations."); Margaux Hall et al., *Rutledge vs. PCMA: The future of state regulation of pharmacy benefit managers in the wake of the SCOTUS decision,* PRACT. INSIGHTS COMMENTARIES (June 25, 2021), https://tinyurl.com/24afsjrr ("The Court's decision in *Rutledge* … appears to expand states' opportunity to regulate actors and industries that are adjacent to, but have a cost impact on, ERISA plans.").

ERISA. PCMA Statement (Dec. 10, 2020) (emphasis added).[2] And in granting summary judgment to Oklahoma, the district court relied almost exclusively on *Rutledge* to explain ERISA and make its decision. *See* Aplt.App. Vol. 3 at 736-39.

Despite all this, the United States does not mention *Rutledge* once in its Statement of the Case, even though that section includes a lengthy explanation of the government's views on ERISA preemption with multiple case citations. When the government finally gets around to *Rutledge*, it merely repeats a single clause from the case as if it represents the Court's entire holding, U.S. Br. at 10, 12, and it implies that *Rutledge* should be limited to its specific facts, *id.* at 15.

But just three years ago the United States filed multiple amicus briefs in *Rutledge*, advocating for a robust vision of state maneuverability, a skeptical view of PBMs, and a narrow view of "connection with" preemption. *See* Brief for the United States as Amicus Curiae, *Rutledge*, 2019 WL 6609430 (Dec. 4, 2019) (supporting Arkansas's petition for a writ of certiorari); Brief for the United States as Amicus Curiae Supporting Petitioner, *Rutledge*, 2020 WL 1190622 (March 2, 2020) (supporting Arkansas on the merits). The tone and substance of those briefs cannot be squared with the United States' current submission.

Three examples should suffice. *First*, bizarrely, the United States now argues that the district court and Oklahoma are "incorrect" to say that the challenged provisions

---

[2]    *Available    at*   https://www.pcmanet.org/pcma-statement-on-u-s-supreme-court-decision-in-rutledge-v-pharmaceutical-care-management-association-pcma/

of the Act lack a connection with ERISA because they do not force ERISA plans to make any "specific choices." U.S. Br. at 14-15 (quoting Aplt.App. Vol. 3 at 737; Okla. Br. at 29). "[N]either the Supreme Court nor this Court," the government claims, "have ever held that state laws have a 'connection with' ERISA plans only if they foreclose plans from taking any approach save one." *Id.* at 14. This is not a fair representation of *Rutledge*, which held that ERISA's primary *and* alternative concerns are with laws that force plans to make a specific choice—just like Oklahoma and the district court said:

> ERISA is therefore **primarily** concerned with pre-empting laws that require providers to structure benefit plans in **particular ways**, such as by requiring payment of **specific benefits**, or by binding plan administrators to **specific rules** for determining beneficiary status. A state law may **also** be subject to pre-emption if "acute, albeit indirect, economic effects of the state law force an ERISA plan to adopt a **certain scheme** of substantive coverage." As a shorthand for these considerations, this Court asks whether a state law "governs a central matter of plan administration or interferes with nationally uniform plan administration."

*Rutledge*, 141 S. Ct. at 480 (emphases added) (internal citations omitted). The Supreme Court repeated this theme throughout its opinion. *See id.* ("ERISA does not pre-empt state rate regulations that merely increase costs or alter incentives for ERISA plans without forcing plans to adopt **any particular scheme** of substantive coverage." (emphasis added)); *id.* at 481 ("Nor is the effect of Act 900 so acute that it **will effectively dictate plan choices**." (emphasis added)); *id.* at 482 ("Requiring PBMs to reimburse pharmacies at or above their acquisition costs does not require plans to provide **any particular benefit** to **any particular beneficiary** in **any particular way**."

5

(emphases added)). The United States' quibble is not with Oklahoma and the district court, apparently, but with the reasoning in *Rutledge* itself.

Rather than comprehensively evaluate *Rutledge*, the federal government relies on much older cases to argue for something closer to the inverse proposition: when "state law materially and directly forecloses central benefit-design choices that would otherwise be available to a plan," it claims, "the law has the relevant 'connection with' ERISA plans even if plans retain some residual flexibility." U.S. Br. at 14 (citing *N.Y. Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins.*, 514 U.S. 645 (1995) and *FMC Corp. v. Holliday*, 498 U.S. 52 (1990)). Even assuming this were an accurate reading of those cases (it isn't), *Rutledge* eliminates this broader potential interpretation of ERISA when it declares that the "central matter of plan administration" question is a mere "shorthand" way of phrasing the same "forced choice" analysis that the United States claims is incorrect. 141 S. Ct. at 480. They are not two different standards, but part of the same analysis that the government, for whatever reason, no longer embraces.

The government's current argument does not align with *Rutledge* itself, nor does it align with the United States' position in *Rutledge*. The government's brief in support of Arkansas's certiorari petition, for example, repeatedly emphasized the very "specific choice" language that it now derides as "incorrect." Indeed, the United States devoted multiple pages to explaining how *Travelers* held that a state law did not have a connection with ERISA because it did "not bind plan administrators to any particular choice'" or "force an ERISA plan to adopt a certain scheme of substantive coverage." Brief for

6

U.S., *Rutledge*, 2019 WL 6609430 at *10-13 (quoting *Travelers*, 514 U.S. at 659, 668). It also insisted that the principle elucidated in *Travelers* was broader than the facts of that case: "Although this case [*Rutledge*] involves a State's methodology governing payments to pharmacies, not hospitals, the principle is the same." *Id.* at *12 (emphasis added). Reading through the United States' description of *Travelers* then, versus its description now, it is difficult to believe the government is even talking about the same case.

*Second*, the United States claims that "Oklahoma incorrectly argues that the Act does not implicate ERISA because it directly regulates only PBMs, not ERISA plans." U.S. Br. at 15. Initially, the government wrongly asserts that the Act applies to more than just PBMs, an argument that will be addressed shortly. Then, it argues that even if the Act applies only to PBMs, such regulations are still the equivalent of regulating ERISA plans. This latter argument is eye-opening because the United States made the opposite argument in *Rutledge*.

In supporting Arkansas's petition for certiorari, for example, the United States argued that it was critical that:

> **The Arkansas law regulates only the relationship between PBMs and pharmacies**. It does not regulate plans themselves or their relationships with PBMs, pharmacies, or plan participants. Like the New York law in *Travelers*, the Arkansas law "leave[s] plan administrators right where they would be in any case," with the responsibility to decide whether it would be worthwhile to contract with a PBM for services. The Arkansas law **therefore** does "not bear the requisite 'connection with' ERISA plans to trigger preemption." …
>
> Unlike the Vermont law in *Gobeille*, the Arkansas law here does not require plans to do anything …. **The Arkansas law imposes obligations on**

7

**PBMs, not plans**. … **The Arkansas law thus regulates PBM administration, not ERISA plan administration**.

U.S. Br., *Rutledge*, 2019 WL 6609430 at *13-15 (emphases added) (internal citations omitted). In its merits brief, the United States echoed the same sentiment *and* deployed the "certain scheme" language in virtually the same breath:

> **The Arkansas statute regulates only the relationship between PBMs and pharmacies**. It does not regulate the relationships between plans and their participants, between plans and their insurers, or even between plans and their PBMs. Thus, unlike the state laws this Court has found to "relate to" ERISA plans, the Arkansas statute does not "force an ERISA plan to adopt a **certain scheme** of substantive coverage," or "mandate[] employee benefit structures or their administration[.]"

U.S. Br., *Rutledge*, 2020 WL 1190622 at *21-22 (emphases added) (internal citations omitted) (quoting *Travelers*, 514 U.S. at 658, 668). The United States has reversed itself. *Cf. Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 698 (1991) ("[T]he case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views."). Nor can the United States' reversal be attributed to *Rutledge*. There, the Supreme Court held that ERISA is *not* connected with Arkansas laws solely regulating PBMs.

Further, in supposedly refuting Oklahoma's position—*i.e.*, its own position, until a week ago—the United States ignores a critical aspect of *Travelers* and *Metropolitan Life Insurance Company v. Massachusetts*, 471 U.S. 724 (1985).  In those cases, the Supreme Court made clear that State "laws that regulate only the insurer, or the way in which it may sell insurance, do not 'relate to' benefit plans" in "the first instance." *Travelers*, 514

8

U.S. at 663-64 (quoting *Metro. Life*, 471 U.S. at 741). That binding precedent has equal application to a PBM, which is another third party that sells services to ERISA plans. And although this point featured prominently in Oklahoma's brief and that of one of its *amici* here, *see* Okla. Br. at 21, 27; NCPA Br. at 5, 21, the United States and PCMA have no answer for why that is not dispositive.

Rather than respond to this binding authority, the United States embraces the (non-binding) Eighth Circuit's view that "[b]ecause PBMs manage benefits on behalf of plans, a regulation of PBMs 'function[s] as a regulation of an ERISA plan itself.'" U.S. Br. at 16 (quoting *PCMA v. Wehbi*, 18 F.4th at 966). But the Eighth Circuit found that the North Dakota PBM regulations in question did *not* connect with ERISA, unlike the government's argument here. In any event, this is yet another flip-flop. For the cited proposition, the Eighth Circuit relied solely upon a 2010 decision of the D.C. Circuit. *Wehbi*, 18 F.4th at 966 (quoting *PCMA v. Dist. of Columbia*, 613 F.3d 179, 188 (D.C. Cir. 2010)). In *Rutledge*, however, the United States identified a circuit split on this precise point, and it expressly agreed with the First Circuit's decision in *PCMA v. Rowe*, 429 F.3d 294 (1st Cir. 2005), in *opposing* the D.C. Circuit's blinkered view. *See* U.S. Br., *Rutledge*, 2019 WL 6609430 at *17-20.[3] Applying that analysis, the United States emphasized that, "[l]ike the Maine law in *Rowe,* the Arkansas law in this case imposes duties on PBMs, but does not 'circumscribe the ability of plan administrators to

---

[3] Oklahoma even cited the government's 2019 brief for this point. Okla. Br. at 24 n.4.

structure or administer their ERISA plans.'" *Id.* at *19 (quoting *Rowe*, 429 F.3d at 303).
And in responding to PCMA's contention that *Rowe* was somehow incompatible with
the Supreme Court's later decision in *Gobeille*, the United States observed that "*Gobeille*
did not cast doubt on *Rowe*'s distinction between regulation of third-party service
providers, on the one hand, and regulation of plans themselves, on the other." *Id.* (citing
*Gobeille v. Liberty Mut. Ins.*, 577 U.S. 312 (2016)).

*Third,* whereas *Rutledge* and the United States in *Rutledge* acknowledged that
PBMs are independent profit-seeking entities, the United States now declines to
describe PBMs at all. But this information matters. The D.C. Circuit's claim that a law
regulating PBMs "function[s] as a regulation of an ERISA plan itself" cannot stand
when the facts indisputably show that PBMs are independent from health plans; they
are for-profit entities; they are not fiduciaries to health plans; and health plans are not
required to use them. Okla. Br. at 5-10. These facts go to the heart of why States regulate
PBMs in the first place—it isn't to get at health plans in a roundabout way, it is to
regulate independent, for-profit mega-corporations that are abusing patients and
pharmacies. Rather than deal with these facts, the United States just omits them.

The United States did not ignore these realities in *Rutledge*. There, it explained
that PBMs "serve as intermediaries between pharmacies and health benefit plans,"
observed that PBMs make their "revenue" on the "difference between the price the
PBM pays to the pharmacy and the price it receives from the health benefit plan," and
stated that pharmacy networks belong to the PBMs, not the health plans. U.S. Br.,

*Rutledge*, 2019 WL 6609430 at *2-4. This latter point is important here, where PCMA is

attacking Oklahoma's network regulations and arguing that PBMs' pharmacy networks

are attributable more to health plans than to PBMs. *E.g.,* PCMA Br. at 1 ("Pharmacy

network design … is perhaps the most important tool at plans' disposal …."). But in

*Rutledge*, the United States labeled "access" to a "**PBM's** pharmacy network" as merely

one of the "services" that a "PBM provides … to the plan." U.S. Br.*, Rutledge*, 2019 WL

6609430 at *4 (emphasis added). Oklahoma's Act does much the same. *See* 36 O.S. §

6960(6) (defining a "Retail pharmacy network" as "retail pharmacy providers contracted

**with a PBM** …." (emphasis added)).

 The Supreme Court did not ignore the nature of PBMs, either. Rather, it found

that PBMs are "intermediaries," that a "PBM's reimbursement from a plan often differs

from and exceeds a PBM's reimbursement to a pharmacy," and that this "difference

generates a profit for PBMs." *Rutledge*, 141 S. Ct. at 478. It also found that Arkansas's

law was adopted "in response to concerns that the reimbursement rates set by PBMs

were often too low to cover pharmacies' costs, and that many pharmacies, particularly

rural and independent ones, were at risk of losing money and closing." *Id.* at 478-79.

And in response to the argument that Arkansas's law "interferes with central matters of

plan administration"—the same argument PCMA and the United States make here—

the Supreme Court simply replied that it was the PBMs' fault for operating like they

did. *See id.* at 482 ("When a pharmacy declines to dispense a prescription, the

responsibility lies first with the PBM for offering the pharmacy a below-acquisition

reimbursement."). The Supreme Court was clear: PBMs can be held to account for their independent actions. But none of this is mentioned by the United States.

To be sure, the United States is entitled to alter its positions, especially across administrations. But two factors render the current shift quite puzzling, even if the government's overall view on ERISA would still lead to the same outcome in this case. First is the United States' failure to acknowledge its prior briefs or any shift in position, despite those briefs being issued so close in time to the present. Second is the government's apparent shift coming after the Supreme Court unanimously *agreed* with the United States—along with a coalition of 45 States—that ERISA "connection with" preemption was being interpreted too broadly by the Eighth Circuit, in a way that improperly hindered state regulation of PBMs. *E.g.*, *Rutledge*, 141 S. Ct. at 482 ("Taken to its logical endpoint, PCMA's argument would pre-empt any suits under state law that could affect the price or provision of benefits."). The United States helped engender an important Supreme Court victory with a massive bipartisan coalition. Then, without explanation, it has switched to some of the overbroad arguments of the very party that the Supreme Court ruled unanimously *against*. Curiouser and curiouser.

**B. The United States' "connection with" analysis fails on its own terms.**

Even ignoring the government's misapprehension of the applicable standard, the United States provides almost nothing other than its own say-so to support its allegations that the three statutory provisions govern plan choices that are "central" and "core" to plan structure and design. U.S. Br. at 12-16.

For example, the government claims that "ERISA has long recognized that a plan's cost-sharing rules are also a core feature of plan design." *Id.* at 13. But the only source the United States cites is a random statutory subsection ensuring that mental health is treated the same as physical health; it says nothing about "central" or "core." 29 U.S.C. § 1185a(a)(3)(A). Similarly, the government cites a different subsection of the same statute as an example of how the "centrality" of the Act's provisions "to plan structure and benefit design is reflected in ERISA itself." U.S. Br. at 12-13. But that provision says nothing about centrality; it merely indicates that health plans "*may* use" network admission standards—not "must" or "shall"—which is a strange way of explaining that something is pivotal or central. 29 U.S.C. § 1185a(a)(7)(C)(ii) (emphasis added). And, of course, that statute does not mention or cover third parties that sell to ERISA plans access to the third parties' provider networks.

In the end, the United States has done nothing to show that the Act regulates plans at all, much less a central matter of plan administration.

### C. The Pharmacy Choice Act applies only to PBMs, and PCMA does not have standing to argue otherwise.

As mentioned above, the United States claims that the "plain text of the [Pharmacy Choice] Act itself" seems to apply to more than just PBMs. U.S. Br. at 16. But the only text cited by the United States simply says that a "pharmacy benefits manager" or "PBM" is defined as a "person that performs pharmacy benefits management." 36 O.S. § 6960(4). It is not "plain" that this means the Act applies *beyond*

PBMs as that term is universally understood. *E.g.*, *Rutledge*, 141 S. Ct. at 478 ("PBMs serve as intermediaries between prescription-drug plans and the pharmacies that beneficiaries use."). To the contrary, additional textual clues counsel in the other direction. The same statute, for instance, states that a PBM is distinct from a "health insurer" or "third-party payor" and that a PBM provides "pharmacy benefits management" services *to* these entities. 36 O.S. § 6960(1), (4). Another provision of the Act reinforces that a PBM is an "entity that provides pharmacy benefits management services under a contract with" a "health plan" or insurer, *id.* § 6962(C)(1)(b), which appears to foreclose the possibility that a PBM could also *be* a health plan or insurer.

In any event, neither PCMA nor the United States has cited any evidence (or even alleged) that Oklahoma has enforced the Act against an ERISA plan. And Oklahoma has consistently interpreted the Act to apply only to independent, third-party PBMs—not to health plans. Moreover, PCMA did not argue in its principal brief or below that the Act applies to ERISA plans that administer their own pharmacy benefits. That is an argument that arose for the first time in PCMA's reply brief on appeal and then was echoed by the federal government.

This echo is peculiar because, once again, the United States sang a different tune in *Rutledge*. There, the government argued that a similarly worded Arkansas definition could be read to apply only to PBMs. Like here, Arkansas defined a PBM to mean "an entity that ministers or manages a pharmacy benefits plan or program." Ark. Code § 17-92-507(a)(7). But unlike here, the United States in *Rutledge* emphasized that this

14

"definition could be read to contemplate only third-party PBMs—'entit[ies]' distinct from the 'plan or program.'" U.S. Br., *Rutledge*, 2020 WL 1190622 at *31. In the alternative, the United States argued that this is not the "occasion for the Court to address the question whether ERISA would preempt the application of the Arkansas statute to a plan that manages prescription drug benefits itself." *Id.* at *30. In any event, the Supreme Court resolved this issue *against* the position the government takes here. It emphasized that Arkansas's law "does not directly regulate health benefit plans at all, ERISA or otherwise." *Rutledge*, 141 S. Ct. at 481.

Given all this, the only reasonable conclusion is that an Act like Oklahoma's—and like Arkansas's—applies only to PBMs. And PCMA, "a national trade association representing the 11 largest PBMs in the country," *Rutledge*, 141 S. Ct. at 479, would not have standing to make such an argument, because it is not here representing ERISA plans. *E.g.*, *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977) ("an association has standing to bring suit on behalf of its members when," among other things, "its members would otherwise have standing to sue in their own right"); *see also* U.S. Br., *Rutledge*, 2020 WL 1190622 at *30 (PCMA's "members are not plans themselves; they are third-party PBMs").[4] Thus, the United States' discussion about the Act being preempted as applied to ERISA plans is irrelevant.

_____

[4] Another hurdle to standing is that the interests of PBMs and ERISA plans are not identical. PCMA's own expert *in this very case*, a health plan consultant, testified that PBMs are "a business that's out to get your money … they're all looking to make a profit on the commercial health plan sponsor." Okla. Br. at 7; *see also Rowe*, 429 F.3d at

### D. Oklahoma has not waived any reliance on the ERISA savings clause, which likewise supports affirmance here.

Despite disagreement about the Act's "connection with" ERISA plans, the United States agrees with Oklahoma that the ERISA savings clause applies. *See* U.S. Br. at 17–22. Because Oklahoma has not waived this issue, the district court's decision should be affirmed regardless of the analysis under the "relate to" question.

As the party claiming preemption, it is PCMA's burden to demonstrate the alleged preemption. *E.g.*, *Day v. SkyWest Airlines*, 45 F.4th 1181, 1184 (10th Cir. 2022). Under ERISA's preemption clause, a State law that "relates to" ERISA plans is preempted "[e]xcept as provided in subsection (b) of this section." 29 U.S.C. § 1144(a). And subsection (b) makes plain that nothing in ERISA relieves "any person from any law of any State which regulates insurance." *Id.* § 1144(b)(2)(A). Thus, in order for PCMA to show that ERISA preempts the challenged provisions as applied to PBMs, it must show that the law "relates to" ERISA plans *and* that the Act is not a law that "regulates insurance." If the State law regulates insurance, it is not preempted. In short, PCMA must meet a two-part test to demonstrate preemption, which it has not done. PCMA claims that Oklahoma has waived the savings clause argument, but Oklahoma cannot waive something for which PCMA never met its initial burden.

---

298 ("PBMs have the opportunity to engage in activities that may benefit the drug manufacturers and PBMs financially to the detriment of the health benefit providers").

In any event, Oklahoma *has* preserved this issue by raising it at the preliminary injunction and summary judgment stages below, as well as in its primary brief on appeal. *See* Okla. Br. at 35 n.7; Aplt.App. Vol. 3 at 696 n.5; Supp.App. at 200 n.2. Oklahoma Defendants raise it again, here. Even if the savings clause issue were incorrectly viewed as something akin to an affirmative defense, the argument would not be waived. Although "[t]he general rule is that a party waives its right to raise an affirmative defense at trial when the party fails to raise the defense in its pleadings[,]" this Court has acknowledged that "the liberal pleading rules established by the Federal Rules of Civil Procedure apply to the pleading of affirmative defenses." *Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1076 (10th Cir. 2009) (citation omitted). Therefore, instead of utilizing a "hypertechnical[]" approach, this Court enforces "the actual purpose of the rule." *Id.* And that ultimate purpose is to give *notice* to the opposing party "of any additional issue that may be raised at trial so that he or she is prepared to properly litigate it." *Id.* PCMA was undisputedly made aware of the argument as early as the preliminary injunction stage, Supp.App. at 200, and it would therefore not be waived.

As for substance, the United States is correct: The savings clause would save the Pharmacy Choice Act from preemption as applied to third-party PBMs under the test established in *Kentucky Association of Health Plans v. Miller*, 538 U.S. 329, 342 (2003). *See* U.S. Br. at 17-22. Applying *Miller*, the Act qualifies even though it regulates only PBMs, because it "suffices" that PBMs "provide only administrative services to self-insured plans," 538 U.S. at 336 n.1, and by "expanding the number of [pharmacies] from whom

17

an insured may receive health services," the Act "alter[s] the scope of the permissible bargains between insurers and [the] insured" and thus "substantially affects the type of risk pooling arrangements that insurers may offer," *id.* at 338-39.

## II. The Pharmacy Choice Act's Any-Willing-Provider provision is not preempted by Medicare Part D.

The United States argues that the Act's Any-Willing-Provider (AWP) provision is preempted not by an inconsistent or overlapping federal regulation, but rather by a federal agency's decision *not* to impose a regulation. CMS has promulgated an any-willing-provider provision for standard pharmacy networks. 42 C.F.R. § 423.505(b)(18). A different regulation authorizes the operation of preferred networks. *Id.* § 423.120(a)(9). But besides this, the government does not point to a single Part D standard that regulates preferred networks that is inconsistent with, or even on the same subject as, Oklahoma's law. That is because no such standard exists. CMS has not regulated the standards by which Part D sponsors maintain preferred networks. Oklahoma's AWP provision does not conflict or overlap with CMS's provision for standard networks, and nothing in Oklahoma's law prohibits PBMs from implementing preferred networks. Therefore, Medicare Part D does not preempt the AWP provision.

Instead of pointing to an inconsistent, conflicting, or overlapping standard, the government asserts that the Act's AWP provision is inconsistent with "the deliberate decision CMS made to require access only to standard networks." U.S. Br. at 23. As the government sees it, the fact that a federal agency considered adopting a standard similar

18

to the AWP provision, and then decided not to, preempts Oklahoma's provision. *Id.* at 23-25. But State laws surely do not fall prey to preemption when the federal government considers and then declines to enact new policies. *See Hillsborough Cty. v. Automated Med. Labs.*, 471 U.S. 707, 717 (1985) (dismissing the view that "whenever a federal agency decides to step into a field, its regulations will be exclusive," because such a rule "would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence."). To hold otherwise would have drastic implications on the "delicate balance" of our federalist system. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

This position is also somewhat contradicted by CMS's previous statements on preemption. For example, to enforce the federal AWP provision regarding standard pharmacy networks, CMS merely requires that network terms and conditions be "reasonable and relevant." 42 C.F.R. § 423.505(b)(18). Presumably, CMS contemplated imposing more onerous restrictions before settling on those minimal requirements. However, in response to PBM exploitation of this minimal regulation, states "enacted laws prohibiting PBMs from requiring additional accreditation" beyond that required by the applicable state board of pharmacy. 83 Fed. Reg. 16,440, 16,598 (Apr. 16, 2018). Instead of asserting that these laws were inconsistent with a CMS policy decision to allow PBMs discretion in determining necessary requirements, CMS tacitly endorsed the state laws, stating that it believes that "state pharmacy practice acts represent a reasonably consistent minimum standard of practice." *Id.* CMS's previous position correctly understood that CMS had set a regulatory floor, but that there was room for

19

states to address regulatory voids. And here, it must be emphasized, CMS *has not even created a regulatory floor*. It has merely authorized the use of preferred networks. As the Eighth Circuit concluded, "a 'standard' for purposes of Medicare Part D preemption 'is a [Medicare Part D] statutory provision or a regulation promulgated under [Medicare Part D] and published in the Code of Federal Regulations.'" *Wehbi*, 18 F.4th at 971 (citation omitted). CMS's decision *not* to promulgate a standard does not meet that definition. There is a complete absence of federal regulation on the details of preferred pharmacy networks—something the United States apparently does not dispute. Citing a similar absence, the Eighth Circuit upheld a North Dakota law that imposed network accreditation standards that filled a gap left by CMS. *See id.* at 972-73.

The case law offered to support the government's preemption theory only serves to betray its novelty. The government cites *Crosby v. National Foreign Trade Council* for an example of where a state law was preempted because the federal statute was "drawn not only to bar what [it] prohibit[s] but to allow what [it] permit[s]." 530 U.S. 363, 380 (2000). But *Crosby* involved a federal law imposing sanctions on Burma while granting the President discretion to adjust the sanctions as necessary for the national security interests of the United States. *Id.* at 373-75. The preempted state law was a Massachusetts act that prohibited "state entities from buying goods or services" from designated persons "doing business with Burma." *Id.* at 366-67. Not only did the state law implicate areas typically reserved to the federal government (international relations and national security), but it also clearly interfered with the aims of the statute. As the

Court explained, "if the Massachusetts law is enforceable the President has less to offer and less economic and diplomatic leverage as a consequence." *Id.* at 377.

Here, however, Oklahoma law regulates "the practice of pharmacy[, which] is an area traditionally left to state regulation." *Wehbi*, 18 F.4th at 972. And no federal law is threatened or inconsistent. Instead, a federal agency decided *not* to impose regulations on this aspect of pharmacy networks.

The government's other case, *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000), provides no support, either. There, the Supreme Court held that a safety standard promulgated by the Department of Transportation preempted "a state common-law tort action in which the plaintiff claim[ed] that the defendant auto manufacturer, who was in compliance with the [DOT] standard, should nonetheless have equipped a 1987 automobile with airbags." *Id.* at 864-65. The federal standard provided for a gradual phase-in of passive restraints, including airbags. *Id.* at 879. The state common law, on the other hand, required all vehicles in the "entire District-of-Columbia-related portion" of the manufacturer's fleet be equipped with airbags. *Id.* at 881. The state common law tort action directly conflicted with the federal standard. *Geier* would, therefore, only be analogous to this case if Oklahoma's law prohibited preferred networks, which it does not.

In our federalist system of government, "the States possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause." *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). The federal

government's ability to "impose its will on the States … is an extraordinary power." *Gregory*, 501 U.S. at 460. To protect state sovereignty, "a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption." *CSX Transp. v. Easterwood*, 507 U.S. 658, 663-64 (1993). Similarly, courts have long been reticent to extend preemption to cover instances of federal inaction. *See, e.g., H.P. Welch Co. v. New Hampshire*, 306 U.S. 79, 84-85 (1939) (holding that a state law regulating how long truckers could drive continuously was not preempted by a federal law that authorized an agency to prescribe regulations governing how long truckers could continuously drive until that agency enacted superseding rules); *P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495 (1988) (holding that Congress's decision to no longer authorize the President to regulate the pricing of petroleum products, allegedly thereby adopting a free market approach, did not preempt Puerto Rico's gasoline price regulation).

Again, the regulation of pharmacies is traditionally understood to be the prerogative of the states. The suggestion that the executive branch of the federal government can preempt state law in an area typically left to state regulation by merely declining to adopt a regulation poses a significant threat to state sovereignty. If adopted, it is hard to imagine any limits on the scope of preemption. Federal agencies consider countless regulations and rules. The government's theory would seemingly exclude all nonadopted agency proposals from the policy toolbox of the states. Any federal agency with a deregulatory bent would be able to bar states from addressing emerging problems

simply by considering and rejecting potential regulations. Such a decision would greatly diminish states' abilities to function as the laboratories of democracy. *See New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting).

Finally, the government expressly declined "to decide whether [Oklahoma's law] is preempted under a broader preemption theory[,]" effectively staying out of the parties' dispute over the scope of Medicare Part D preemption. U.S. Br. at 24 n.6. But the government's silence suggests that the overlapping standard advocated by Oklahoma *is* a plausible reading of Part D's preemption language. And the State continues to urge this Court to adopt its overlapping standard for Part D preemption, Okla. Br. at 42-46—the standard that every other court to consider the issue has adopted. *See Wehbi*, 18 F.4th at 971-72 (collecting authorities).

In short, the preemption clause governing Medicare Part D provides that "[t]he standards established under this part shall supersede any State law or regulation … with respect to [Part D plans] which are offered by [Part D sponsors] under this part." 42 U.S.C. § 1395w-26(b)(3). And "[t]he term 'supersede' … suggests a replacement or substitution instead of a blanket pre-emption." *Rutledge*, 141 S. Ct. at 483-84 n.2 (Thomas, J., concurring); *accord Wehbi*, 18 F.4th at 971. Therefore, the preemption clause contemplates something significantly less than field preemption and more akin to an overlapping standard.

An interpretation as broad as PCMA's proposed standard—or the United States' new theory of "governmental thoughts" preemption—would essentially preclude any

regulation of PBMs. But CMS itself once wrote that it does "not believe that the Congress intended for each and every State requirement applying to [Part D plans] to become null and void." 70 Fed. Reg. 4,194, 4,319 (Jan. 28, 2005). The government's argument that "PBMs stand in the shoes of Part D sponsors and create pharmacy networks to provide drugs to enrollees in those sponsors' prescription drug plans[,]" U.S. Br. at 25, does not mean that any state regulation targeted at PBMs is preempted—especially considering the absence of federal regulations on preferred networks. The federal regulations cited in support of this proposition, 42 C.F.R. § 423.505(i), merely ensure that a Part D plan sponsor cannot escape federal regulations by contracting with a PBM. Therefore, they do not insulate PBMs from state regulation.

For these reasons and more, Oklahoma's Any-Willing-Provider provision is not preempted by Medicare Part D.

### CONCLUSION

Neither ERISA nor Medicare Part D preempt Oklahoma's Pharmacy Choice Act. Accordingly, this Court should affirm.

s/ *Zach West*

GARRY M. GASKINS, II
  *Solicitor General*
ZACH WEST
  *Director of Special Litigation*
WILL FLANAGAN
  *Assistant Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
garry.gaskins@oag.ok.gov
zach.west@oag.ok.gov
william.flanagan@oag.ok.gov

*Counsel for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

This response complies with the typeface requirements of Fed. R. App. P. 32 because it was prepared in a proportionally spaced font (Garamond, 14-point) using Microsoft Word 2016. The document complies with the type-volume limitation of Fed. R. App. P. 32, because it contains 6,494 words, excluding the parts exempted.

s/ *Zach West*
ZACH WEST

## CERTIFICATE OF DIGITAL SUBMISSION

All required privacy redactions have been made as required by 10th Cir. R. 25.5 and the ECF Manual. Additionally, this filing was scanned with Crowdstrike antivirus using the latest version updated on April 6, 2023.

s/ *Zach West*
ZACH WEST

## CERTIFICATE OF SERVICE

I certify that on April 17, 2023, I caused the foregoing to be filed with this Court and served on all parties via the Court's CM/ECF filing system. The seven required paper copies, each of which is an exact replica in form and content, will be dispatched via commercial carrier for receipt within five business days after the court issues a notice that the electronic version is accepted for filing.

s/ *Zach West*
ZACH WEST